## S. L. HITCHCOCK ET AL. v. FRANK BACON.

ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF ALLE-GHENY COUNTY.

Argued October 28, 1887—Decided January 3, 1888.

When a building under lease to a tenant has been torn down and removed by city authorities as dangerous and unlawful, the mere acquiescence of the owner, or the fact that the eviction was desirable to him, will not make the owner liable to the tenant for injuries incurred

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

No. 136 October Term 1887, Sup. Ct.; court below, No. 444 June Term 1886, C. P. No. 1.

On May 1, 1886, a summons "in trespass on the case" was issued in a suit by Frank Bacon against L. P. Hitchcock and Sarah L., his wife, and Thomas Liggett. The declaration averred that on April 13, 1885, the plaintiff was in the lawful occupancy of a store-room on the first floor of the building and premises at No. 446 Smithfield street, Pittsburgh, for the term of one year ending March 31, 1886, under a lease from said defendants; that said store-room was stocked and filled with many and divers goods, etc.; that the defendants well know-ing, etc., and in breach of the covenant of quiet enjoyment,

" did, unlawfully and by force and arms, enter upon the said premises and by their agents, employees and workmen did then and there, unlawfully and by force of arms, pull down and destroy the said building and store-room," etc. To this declaration, the defendants pleaded, not guilty, and, specially, that the plaintiff was not in lawful possession of said premises on the day, etc.; that the occupation and maintenance of said building had become dangerous and unlawful and that by notice and proceedings of the proper officers of the city, commenced before March 1, 1885, and due notice to the plaintiff, the said building was ordered to be torn down, and was entered upon and torn down by such lawful authority; and, further, that prior to March 1, 1885, because of the plaintiff's failure to pay his rent due, the defendants caused notice in writing of the forfeiture of his lease to be served upon the plaintiff, with a written demand of possession, in accordance with the terms of the lease.

At the trial on May 9, 1887, it appeared that in 1883 a lease, expiring on April 1, 1884, at $500 per annum, was made to the plaintiff, by Sarah L. Hitchcock, the owner of the property. It was not formally renewed in 1884, but the plaintiff held over, a three months notice to quit not having been given. On April 27, 1884, a child was killed by the fall of a part of a wall of the building occupied by the plaintiff and on May 15, 1884, a notice was served upon Thomas Liggett, the agent of the owner in the renting and management of her buildings, by J. C. Brown, the city inspector of buildings, to the effect that, at the request of two citizens, he had examined said building and found it in a dangerous condition, and directing him to " forthwith remove or repair," the same, etc. A like notice was served on January 16, 1885; another on March 25, 1885; and on April 3, 1885, a peremptory notice to remove the building in five days, was served upon said agent. On April 13, 1885, P. J. Devlin, under contract with the city authorities, proceeded, after notice to the plaintiff, to tear the building down compelling the plaintiff to move out, who thereupon brought this suit. The other material facts fully appear in the charge of the court below and in the opinion of this court.

The court, STOWE, P. J., charged the jury orally:

After April 1, 1884, we find Bacon in possession of these premises under a lease that expired on April 1, 1885, or would have expired, provided Liggett or the Hitchcocks had given him notice to go out at that time; but, because of the failure to give that notice he had a right to hold over from April 1, 1885, to April 1, 1886. Then, we find, as part of the history of the case in evidence, that Kaufmann Bros. made an arrangement with the Hitchcocks to lease this property, and they were to have possession on April 1, 1885. Bacon was in possession with the right to stay until April 1, 1886, one year later than the time agreed upon for the Kaufmanns to take possession. While that was the existing state of facts, we find the defendants putting this provision in their lease with the Kaufmanns: "The parties of the first part covenant and agree to give the said J. Kaufmann & Bros. absolute, quiet and full possession on April 1, 1885, of all the property hereby demised, or if any person refuses to quit the same, then the parties of the first part are to have said tenant ejected as soon as possible, and if the possession is not given before May 1, 1885, then this lease, at the election of J. Kaufmann & Bros., shall be null and void."

Such then was the condition of affairs when the negotiations between the plaintiff and the defendants, through Mr. Liggett, are said to have occurred, and that brings us to the first question in the case. Bacon had a right to remain there after April 1, 1885, for a year. [The owners of this property were interested, of course, in getting him out, for as we see, they had covenanted and obligated themselves to give possession of the property to the Kaufmanns. The question then was, how are we going to get Bacon out? And I suggest the matter of the lease to the Kaufmanns as bearing on the fact we submit to you, whether or not in these proceedings, particularly that portion which involved the ejectment, the Hitchcocks and their agents are to be held responsible, or whether these facts throw any light upon the question of whether or not these were the acts, legal or illegal, of the city officials and those acting under them; because if the ejecting was done by the city officials alone, without connivance or unknown to the owners of the property, they standing back, not interfering

when they might have interfered, the city authorities are responsible, and not the defendants. But if this thing was done by an arrangement, done by connivance of the defendants, if the thing was allowed to go on in bad faith, was put in that shape by them, or, if not concocted, even acquiesced in by them, so as to bring about that which otherwise would not have happened, they are as much responsible as if they had stood on the curbstone and given general orders to "tear away, boys, and throw him out."] [4]

[The defendants allege that, about March 25th, Mr. Liggett made an arrangement with Bacon to go out for the consideration of $150.] [7] If you believe that, it ends the plaintiff's case; it was his duty to go; he was under contract to go; if he did not, the parties would have had a right, without the interference of anybody else, to employ men, or go themselves, and take his goods and quietly and decently put them out, and if he did not go out, personally, to quietly pick him up and set him gently on the curbstone, and he would have had no right to complain. He was there in violation of law, he was a trespasser, and the law gives the right to a man to get possession of his property, if he can do it peaceably, not doing any injury or producing a breach of the peace, even without legal proceedings. It is not controverted in this case that if this contract was made by Bacon your verdict should be for the defendants. The counsel for the defendants so allege, and the counsel for plaintiff do not controvert the position, and certainly it is incontrovertible.

[The property was torn down; it was torn down by a man named Devlin; as far as his testimony goes, the city officer or street commissioner gave him directions, and upon the face of it the work seems to have been done by the city officials. If that were all, and if it were the real fact, that these defendants did not interfere with or connive at the tearing down in such a way as to make them personally participants in the act, for their own purposes, they cannot be held personally liable, whether they got the benefit of it or not. Had then the defendants anything to do with the plaintiff's eviction? Did they or some one of them participate in or connive at the removal of the plaintiff from the premises in question?] [6] You have heard what has been said by the counsel. [You have for your

consideration the fact that Bacon was there with the right to stay for another year; that his staying there might seriously interfere, and probably would, with the execution or carrying out of this contract, which would probably be, it may be assumed it was, a benefit to the defendants; that Devlin had previously done work for the defendants; that the inception of this thing, as far as he, Devlin, was concerned, seems to have been with Liggett, the agent for the other defendants; that after the work was done Devlin's bill was approved by the street commissioner, and the money paid by Liggett, as the agent of the defendants. Whether these facts are sufficient to satisfy you fairly that the Hitchcocks were conniving at this thing, that it was not merely a collateral proceeding in which they were taking no part, but that they were actually the parties who were bringing it about, is for you to say.] [5] If they are not sufficient to satisfy you, fairly lead you to that conclusion, your verdict must be for the defendants on that point. . . . .

As to the first question, are you satisfied by the weight of the testimony, because the burden of proof is on the plaintiff to satisfy you of that, that these defendants, or some of them, had anything to do with the getting up of that which resulted in the ejectment of the plaintiff? If you cannot conclude that they had, then you must necessarily find a verdict for the defendants, and the plaintiff must find his remedy for his injury, if he has been injured, somewhere else. But if you should find, if the evidence leads you fairly to conclude, that the defendants are responsible, that they were conniving at or bringing about this eviction, whatever means may have been used, then you have to go to another question; because as I have said, if there was an agreement he should go out, they had a right to put him out, and it will not make the right any less because the defendants may have recurred or resorted to a subterfuge or circumlocution. If they had a right to go and throw him out bodily, it don't make them liable because they may have resorted to this other means. It don't change the aspect of the case at all. It stands just precisely as if they had gone there themselves, and makes it no better or worse that they used the city officials to accomplish a proper purpose. Was the arrangement made, as claimed by the defendants, that the

plaintiff was to go out on the 1st of April, and was to have $150 for going? If you believe it was, that ends the plaintiff's case, and would, even if the defendants stood in court avowing the eviction was at their request and expense, or if they had been personally concerned in it. If you find that the defendants are liable by reason of their participation in this eviction, has the plaintiff a right to complain of their turning him out contrary to law, and that depends on whether or not he agreed for the consideration that has been mentioned, or for any consideration, to go on the 1st of April and refused to take it. If you should find he did, he cannot recover against anybody; or if you should find that he did not make that arrangement, and that he was turned out without the interference or participation of the defendants, your verdict should be for them, because although the plaintiff has been wronged, there is no evidence to show that the wrong was done by the defendants, and you cannot hold one party, who has not been a participant, responsible for the wrong done by another.

[The court read and answered the defendants' points, as follows :]

1. That under the pleadings and evidence the plaintiff cannot recover.

Answer: Refused. It is a matter for the jury to determine, under all the testimony, whether the defendant actually participated, directly or indirectly, in the eviction, and of course involving the right, as I have said, to turn the plaintiff out, if they did participate.[1]

2. That if, as the testimony shows, the building was torn down, and the plaintiff put out by the officers of the city of Pittsburgh without doing so at the instance of the defendants, the plaintiff cannot recover.

Answer: Refused. This is refused, and refused on what I take to be a proper meaning of the word "instance." If it appears that defendants connived at, or by active or passive means allowed or encouraged the acts of those who tore down the house for the mere purpose of ejecting plaintiff, they would be liable; but if the proceeding to condemn the property was not at the instance, or with, at least, the connivance of the defendants for the purpose of illegally ousting plaintiff, but was the

sole act of the city officials, whether legally or illegally executed, plaintiff has no remedy against defendants, and your verdict should be in their favor.[3]

3. That under the evidence if the plaintiff is entitled to recover he cannot recover for loss and profits, or other than his direct and immediate damages.

Answer: Refused.

4. There is no evidence in this case showing that the defendants took any part in ejecting the plaintiff, or taking down the building.

Answer: Refused.[2]

5. That if the jury believe the testimony of Thomas Liggett, M. A. Woodward and H. C. Love as to the plaintiff's agreement to go out of the premises, and the testimony of H. C. Love thereon is wholly uncontradicted, then the plaintiff cannot recover in this action.

Answer: I don't know whether I ought to affirm that point or not. I will say this: If you believe the facts testified to by those gentlemen, the plaintiff cannot recover; or, in other words, if you believe that this contract was made as alleged by them, as their evidence would indicate it was made, the plaintiff cannot recover.

6. That if the jury should find from the evidence that any of the defendants did tell Bacon to take down the building, still to make them liable the jury must find from the evidence that such defendant or defendants were in some way instrumental in tearing it down.

Answer: Affirmed.    [The court concluded the oral charge as follows:]

If, on the whole, you think the plaintiff is entitled to damages, you come to the question of how much. [In the first place he would be entitled to recover the direct injury done to his stock by reason of the removal, the damage done by the snow or rain, if there was any, or any other injury done that would decrease the money value of it as it stood previous to the removal, and as it stood in the new store after it was removed, assuming that it was removed with due care.    At all events, we can say that he is entitled to recover the actual damage done by the proper removal of the stock, whatever that may have been.    He is then entitled to recover the difference be-

tween what he had to pay in rent in the place that he was, and the rent that he had to pay, not what he agreed to pay, in the new place. The evidence don't show he could have gotten a better place for a less price, or one that would have answered better. Those are two elements. Then, there is another, and one a little more difficult to determine, and which, under our view of the law, we must submit; that is, the actual loss of profits or to his business arising from this removal.][8] It appears he was making a certain amount of money before. Of course, the jury cannot tell what he would have made the ensuing year, but what he made the year before is some basis to go on, and we have got to judge of the future by the past. That would give you some data as to what he probably would have made, but you see we get into probabilities here and then you have the testimony as to what he did make.

Did that result from causes not consequent to the removal, from bad business, or from neglect of the business, or from anything other than the mere fact that he was compelled to move his place of business, and as incident to the change? Of course, where a man has an established business and moves, it takes him some time to get it back. In a city like this where there is so much competition even a short distance sometimes makes considerable difference. All that is to be considered by the jury. He would have had a right to stay to April 1, 1886, and no longer. You can only consider what he would have made that year, because the defendants could then have given him notice, and I presume they would have exercised the right and made him go out.

Those three matters constitute the subjects which you have a right to consider, and for which you would have a right to return a verdict for damages based on your judgment, reasonable damages, as to the amount to appropriate to each of those particular items.

The jury returned a verdict for the plaintiff for $1,650. Judgment being entered, the defendants took this writ, assigning for error:

1–3. The answers to the defendants' points.[1 2 3]

4–8. The parts of the charge embraced in [ ][4 to 8]

*Mr. M. A. Woodward*, for the plaintiff in error:

The declaration was purely in trespass vi et armis. It was pleaded thereto that the building had become dangerous and unlawful, and that, by proper proceedings and lawful authority, the city officers had entered upon and torn it down. This authority was exercised under § 1, act of April 8, 1867, P. L. 918, and § 1, act of March 28, 1870, P. L. 643. The act, necessary and lawful, was performed decently and in order, and even if it had suited the interests of the defendants, or even if they had actively encouraged or passively acquiesced in it, how can it be said in this case that, not those who did the act, but those who didn't do it, are liable? Moreover, there was no legal or pertinent evidence to be submitted to the jury to find that the defendants ever so remotely were the moving power in the doing of the act charged. Yet the case was submitted upon the inferences to be drawn from the mere interest of the defendants, as evidence that they were parties to the act. The error in the seventh assignment was in the mistake of the court in the charge, misleading in an important question of fact. The defendants "alleged" and our testimony established that before the building lease was made to Kaufmann Bros. on February 26, 1885, they had arranged with the plaintiff to allow him $150 on his rent and that he would go out on April 1st. This arrangement was not a month after the improvement lease.

*Mr. Phil. H. Knox* (with him *Mr. Jas. S. Reed* and *Mr. Geo. W. Acklin*), for the defendant in error:

The issue was, who ejected the plaintiff? The jury found that it was the act of the defendants. The evidence was abundantly sufficient to connect the defendants with the eviction.

The provisions of the acts of 1867 and 1870 were not observed. The building inspector did not " notify the owner of said building (or his agent) that he will go on the premises and inspect the same." Nor did he direct the street commissioner to remove the buildings as the acts require. There was no reference to arbitrators, no condemnation of the building at all.

OPINION, MR. JUSTICE GREEN:

This was an action of trespass on the case brought by a tenant against his landlord to recover damages for an alleged

forcible eviction from the demised premises during the pendency of the term. The defence was that the building was removed by the authorities of the city of Pittsburgh, where it was situated, because it was in a dangerously dilapidated condition, in pursuance of a city ordinance authorizing the removal of buildings for such cause. On the trial it was proved beyond all question that the building was in fact torn down by the city officials; but the plaintiff claimed that this was done by the procurement of the defendants in order to get rid of the plaintiff who refused to leave the premises. The learned court below told the jury that if it were in fact torn down by the city authorities and that were all, and the defendants did not interfere with or connive at it in such a way as to make them personally participants in the act for their own purposes, they could not be held liable, whether they got the benefit of it or not. This was certainly correct, but the court also charged that if the tearing down was done by the connivance of the defendants, "or if not concocted, even acquiesced in by them so as to bring about that which would not otherwise have happened, they are as much responsible as if they had stood on the curbstone and given general orders to ' tear away boys, and throw him out.'" We are not able to agree to this as a correct statement of the law applicable to the case.

The substance of this portion of the charge, as we understand it, is that mere acquiescence by the owners without any effort to resist the action of the city authorities, would make them liable in damages to the plaintiff as for a forcible eviction actually made by themselves. That proposition involves consequences to which we cannot assent. Granting that the eviction was desirable to the defendants; that it accomplished their wishes and gave them an important advantage over the plaintiff in the matter of getting rid of him as a tenant, still it was not their act. On the contrary, it was the undoubted act of the city officials. If wrongfully done they were responsible, and if rightfully done, of course there could be no recovery and the court so charged the jury. The city officials assumed all the responsibility for the destruction of the building, and the proof upon this subject was so conclusive that it cannot be questioned, and in truth was not questioned by the court in the charge. The person who tore down the building was one

Devlin, who testified that he took it down under a contract to do so, made with Bigelow the city engineer and Linderman the street commissioner. Bigelow being examined testified: " Q. Did you make any contract with Mr. Devlin with relation to that house? A. Yes sir; I did through Mr. Linderman. I sent Mr. Devlin to Mr. Linderman; had Mr. Linderman to make the contract. Q. The contract in relation to what? A. Taking down the building occupied by Mr. Bacon on Smithfield street." Repeated notices were given by the city authorities that the building was in a dangerous condition, and in the first of these dated May 15, 1884, the defendants were directed by the building inspector either to remove or repair the building forthwith. In January, 1885, another notice was given. On March 25, 1885, another notice was given of which the following is a copy :—

Office of Inspector of Buildings,
PITTSBURGH, March 25, 1885.

To Mr. THOS. LIGGETT, Agt.

You are hereby notified that at the request of two citizens of the city I have examined your building, situate on Smithfield street, being No. 446 of said street, occupied by Frank Bacon, and find that it is in a dangerous condition, and order and direct that you forthwith remove the same, upon failure of which I will proceed according to law.

J. C. BROWN, Building Inspector.

On April 3, 1885, another notice was served upon the defendants, of which the following is a copy :—

PITTSBURGH, April 3, 1885.

THOS. LIGGETT, Agent.

Dear Sir :—You are hereby notified to remove the building from No. 446 Smithfield street (now occupied by Frank Bacon), within five (5) days, or I will be compelled to do the same at your expense. Respectfully,

E. M. BIGELOW, City Engineer.

Notwithstanding these notices the defendants did not remove the building, and thereupon Bigelow, who was both city engineer and highway commissioner, directed Linderman to contract with Devlin to take it down.

In the face of this testimony it is useless to contend that the removal of the building was not the deliberate act of the city officials. The dangerous condition of the building was fully proved, and, indeed, is not questioned. The removal was effected after most ample notice to the plaintiff, who was given

all the time he needed to remove his stock, and did remove it to another building, which he had previously rented for the purpose. It is of no consequence, if it be true, that there was not an inspection of the building, and an arbitration upon the question whether the building was dangerous. Those are rights of the owners of which they may avail themselves if they desire. But in view of the very positive testimony as to the condition of the building, an arbitration would have been of no service in preventing an order for its removal; and in any event the right to contest the granting of the order was personal to the owners and was no concern of the plaintiff. The order was made by the proper official, and was literally carried out under his direction ; and if the removal was an illegal act, the plaintiff has his remedy against those who were guilty of it. We are not referred to any testimony showing that either of the Hitchcocks had anything whatever to do with the removal of the building by the city authorities, nor have we been able to discover any such testimony in the case. Nor can we discover any evidence connecting Liggett, their agent, with the removal in any such manner as to render him or them liable therefor. The first and second points of the defendants should have been affirmed. The first six assignments of error are sustained. The consideration of the last two is not necessary.

Judgment reversed.